IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| **EIDOS DISPLAY, LLC, EIDOS III, LLC,**<br><br>Plaintiffs,<br><br>v.<br><br>**CHI MEI INNOLUX CORPORATION, CHI MEI OPTOELECTRONICS USA, INC., CHUNGHWA PICTURE TUBES, LTD., HANNSTAR DISPLAY CORPORATION, HANNSPREE NORTH AMERICA, INC.,**<br><br>Defendants. | § § § § § § § § § § § § § § § §   CIVIL ACTION NO. 6:11-CV-00201-JRG |

**REDACTED MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiffs' Motion to Exclude Opinions and Testimony of Defendants' Expert, Mr. Daniel Jackson. (Doc. No. 678.) Defendants have filed a response (Doc. No. 698), and Plaintiffs have filed a reply (Doc. No. 704). Upon consideration, the Court **DENIES-IN-PART** and **GRANTS-IN-PART** Plaintiffs' Motion (Doc. No. 678.)

**BACKGROUND**

On April 25, 2011, Plaintiffs filed suit against AU Optronics Corporation, AU Optronics Corporation America, Chunghwa Picture Tubes, Ltd., HannStar Display Corporation, Hannspree North America, Inc., Chi Mei Innolux Corporation, and Chi Mei Optoelectronics USA, Inc., alleging infringement of U.S. Patent No. 5,879,958 ("the '958 Patent"). (Doc. No. 1.) The '958 Patent is titled "Method of Producing an Electro-Optical Device" and relates to the process of forming circuitry used in controlling liquid crystal displays ("LCD"). Specifically, the '958

1

Patent relates to the process for forming an array of thin film transistors ("TFT") and pixel electrodes that are used to control the light emission of an LCD. Notably, the '958 Patent contains 17 embodiments (identified as A-S) providing various manufacturing processes that reduce the number of photolithographic steps. *See* '958 Patent at 4:50–14:18 (describing processes with four or five lithographic steps as opposed to seven).

Claim 1 is the only issued claim in the '958 Patent. Claim 1 recites as follows:

1. A method for producing an electro-optical device in which an electro-optical material is put between a pair of substrates opposed to each other, at least a portion of opposing surfaces of the substrates is insulative, a plurality of source wirings and a plurality of gate wirings are formed crossing each other on the surface of one of said pair of substrates and a transparent pixel electrode and a thin film transistor are formed at each of the crossing points between the source wirings and the gate wirings, wherein the method comprises:
   a step G1 of forming a first metal film on the surface of said one substrate,
   a first photolithographic step G2 of patterning the first metal film to form a gate electrode and a gate wiring,
   a step G3 of forming a first insulator film, a semiconductor film and an ohmic contact film on the surface of said one substrate after the first photolithographic step,
   a second photolithographic step G4 of patterning the semiconductor active film and the ohmic contact film to form a semiconductor portion above the gate electrode in a state isolated from other portions,
   a step G5 of forming a second metal film on the surface of said one substrate after the second photolithographic step,
   a third photolithographic step G6 of patterning the second metal film

>   and the ohmic contact film to form a source electrode, a drain electrode and a channel portion,
>   a step G7 of forming a passivation film on the surface of said one substrate after the third photolithographic step, and
>   a fourth photolithographic step G8 of patterning the passivation film to form a contact hole reaching the gate wiring, a contact hole reaching the drain electrode and a contact hole for source wiring and gate wiring connection terminals,
>   a step G9 of forming a transparent conductive film on the surface of said one substrate after the fourth photolithographic step, and
>   a fifth photolithographic step G10 of patterning the transparent conductive film to form a transparent pixel electrode.

'958 Patent at 58: 5–47.

On March 6, 2017, Plaintiffs brought the instant *Daubert* Motion to exclude certain of Mr. Jackson's damages opinions. (Doc. No. 678.)

## LEGAL STANDARD

Rule 702 provides that an expert witness may offer opinion testimony if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed.R.Evid. 702.

The Rules also "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 594, 597 (1993). "The relevance prong [of *Daubert*] requires the

proponent [of the expert testimony] to demonstrate that the expert's 'reasoning or methodology can be properly applied to the facts in issue.'" *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (quoting *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999)). "The reliability prong [of *Daubert*] mandates that expert opinion 'be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief.'" *Johnson*, 685 F.3d at 459 (quoting *Curtis*, 174 F.3d at 668).

In assessing the "reliability" of an expert's opinion, the trial court may consider a list of factors including: "whether a theory or technique . . . can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," "the known or potential rate of error," "the existence and maintenance of standards," and "general acceptance" of a theory in the "relevant scientific community." *Daubert*, 509 U.S. at 593–94; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) ("*Daubert* makes clear that the factors it mentions do *not* constitute a 'definitive checklist or test.'"); *U.S. v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010). "The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Johnson*, 685 F.3d at 459 (quoting *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc)). At base, "the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court." *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).

## DISCUSSION

Plaintiffs move to exclude the opinions of Mr. Jackson, Defendants' damages expert, on the following four bases: (1) "Mr. Jackson arbitrarily analyzes only damages for contact holes in a portion of one claim step (G8), and thus fails to analyze a reasonable royalty for a license to the

4

'958 Patent"; (2) "Mr. Jackson's 'contact hole apportionment' is calculated by adopting an arbitrary ▮ 'reduction' that is contrary to the law and is based on an irrelevant settlement payment"; (3) "Mr. Jackson intends to offer the jury nine flawed apportionment approaches, and an average of all nine approaches, all of which are purely speculative and lack any evidence"; and (4) Mr. Jackson's TFT Array base calculation is flawed. (Doc. No. 678, at 6.)

### A. Apportionment

As to the first basis to exclude Mr. Jackson's testimony and opinions based on Mr. Jackson's apportionment, Plaintiffs argue that Mr. Jackson's approach is fundamentally flawed because he values only the "novelty" of the G8 claim step over the prior art rather than the value of claim 1. (Doc. No. 678, at 10.) Plaintiffs cite to the following portion of Mr. Jackson's deposition testimony as an example:

> Q. So on page 59, paragraph 106 of your report, Mr. Jackson, in the last sentence you say, "Consequently the focus of the hypothetical negotiation would be on the incremental benefits or value offered by use of two separate contact holes as opposed to one shared contact hole." Correct?
>
> A. Correct.

(Doc. No. 678-2, at 60:22–61:03.)

Plaintiffs argue that this approach is improper under *Georgia-Pacific* because the royalty rate should address "the added value attributable to the invention" and to remove the conventional elements is legally improper. *Id.* at 13.

Defendants argue that Mr. Jackson properly considered the value provided by the novel aspects of the G8 step of Claim 1 over the conventional steps of the claimed method (steps G1-G7 and G9-10). (Doc. No. 698, at 14.) Specifically, Defendants argue that Mr. Jackson apportioned the sales price of a TFT Array (reflected in the royalty base) to isolate only those parts of the TFT Array that could not have been formed using conventional methods. *Id.*

5

Defendants contend this approach is consistent with Federal Circuit authority that allows for apportionment below the smallest saleable unit if the smallest saleable unit contains significant unpatented features. *Id.*

In a reasonable royalty analysis, damages must be tied "to the claimed invention's footprint in the marketplace." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). Thus, "where multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (citing *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014)). When the accused products have both patented and non-patented features, the damages analysis requires an apportionment analysis in order to determine the value added by such features. *Id.*

Here, the parties' fundamental dispute is whether apportionment should be directed to the "incremental benefit" of the claimed invention. As an initial matter, the case law indicates that damages analyses should account for the incremental benefit conferred by the non-conventional elements of a patent claim taken as a whole. *See Astrazeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1339 (Fed. Cir. 2015); *University of Pittsburgh of Commonwealth v. Varian medical Sys., Inc.*, 561 F. App'x 934, 947–50 (Fed. Cir. 2014); *see also Ericsson*, 773 F.3d at 1226; *ResQNet.com*, 594 F.3d at 869. For instance, in *Astrazeneca* the Federal Circuit found that in evaluating the value of a claimed novel combination of otherwise old or conventional elements, "the question is how much new value is created by the novel combination, beyond the value conferred by the conventional elements alone." *Astrazeneca*, 782 F.3d at 1339. In *University of Pittsburgh*, the Federal Circuit emphasized that certain *Georgia-Pacific* factors additionally

guarded against compensation for more than the added value attributable to the invention. 561 F. App'x at 947–50. In other words, the case law supports an approach that identifies the "incremental benefit" created by the invention to assess appropriate damages ultimately associated with a patent claim.

Because Defendants contend that the incremental benefit of known conventional processes lies in step G8 of claim 1 (Doc. No. 698, at 16), Mr. Jackson's approach is not flawed by attributing value to this feature of the claim. Whether or not step G8 is in fact attributable to the novelty of the invention is a question of fact for the factfinder. At least in part, Plaintiffs' technical expert agrees that step G8 creates an improvement in yield in the production process associated with the value of the claimed invention. *See* Doc. No. 696-2, at 116:18–118:21 ("…for instance, the multiple contact holes in the fourth lithographic step, it leads to a process that will not only reduce the number of steps, but lead to … yield improvements…"). Moreover, there is no indication that Mr. Jackson excluded the alleged conventional aspects of the claim, but simply that he identified them and focused his analysis on the incremental benefit of the claim as a whole. For these reasons, Mr. Jackson's approach is not unreliable and Plaintiffs' motion to exclude his opinions and testimony on this basis is **DENIED**.

### B. AUO Settlement Agreement

Plaintiffs next argue that Mr. Jackson errs by relying on one litigation settlement agreement to impose an ▮ discount—the "AUO" settlement agreement. (Doc. No. 678, at 11.) Plaintiffs' challenge presents a threshold question as to the admissibility of the AUO settlement agreement.

While settlement licenses have been used to assess damages in patent litigation, their admittance is never obtained without scrutiny because of the inherent risk they pose in skewing a

reasonable royalty calculation. *See ResQNet,* 594 F.3d at 872 (noting that "the hypothetical reasonable royalty calculation occurs before litigation and that litigation itself can skew the results of the hypothetical negotiation); *LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 77 (Fed. Cir. 2012) (acknowledging the Federal Circuit's "longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages."). In assessing admissibility, the court determines whether the probative value of that evidence is substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury. Fed.R.Evid. 403. Specifically, when looking at a settlement license agreement, the court must determine the reliability of the settlement license agreement in the context of the hypothetical negotiation and the economic demand for the patented technology. *LaserDynamics,* 694 F.3d, at 77–78.

Here, the settlement agreement in question occurred between Plaintiffs and former-defendant, AU Optronics Corporation "AUO," on August 18, 2015, during the pendency of this litigation. (Doc. No. 698-8.) At this time, the case was recently remanded from the Federal Circuit and the Court had set a hearing to reset a jury trial date. (Doc. No. 495.) ████████████

████████████████████████████████████████████████

████████████████████

The Court has serious concerns regarding the probative value of the AUO settlement agreement. Here, the AUO settlement agreement was executed not only 10 to 13 years *after* the hypothetical negotiation date for each Defendant, but it was executed at a point in time after the '958 Patent had expired. This is a point Defendants do not address. Notably, the hypothetical negotiation framework "seeks to discern the value of the patented technology to the parties in the

8

marketplace when infringement began." *LaserDynamics,* 694 F.3d, at 76. Given that the hypothetical negotiation framework occurs at the time infringement begins, the hypothetical negotiation assesses future liability and damages. Here, not only was the AUO agreement executed to resolve active litigation at a point when a jury trial date was approaching (thereby potentially skewing the hypothetical negotiation), it was also executed in the framework of AUO's only liability being past infringement and past damages, as the '958 Patent was expired at the time the agreement was signed. *See LaserDynamics,* 694 F.3d, at 78 (finding the "settlement, entered into a full three years after the hypothetical negotiation date… in many ways not relevant to the hypothetical negotiation analysis."). Not only do these circumstances diminish the relevance of the AUO settlement agreement to the hypothetical negotiation, the fact that the '958 Patent was expired at the time the AUO agreement was executed actually drives an opposite approach to the negotiation framework. For these reasons, the probative value of the AUO agreement is extremely low while its risk for misunderstanding or application by the jury is high.

Defendants argue that "arguments about the comparability between the settlement agreement and the hypothetical negotiation presents a fact issue for the jury, not an issue under *Daubert.*" (Doc. No. 698, at 19.) But the question of the agreement's general admissibility is a matter for pretrial. *See LaserDynamics,* 694 F.3d, at 78 (holding the settlement license agreement in question had "very little relation to demonstrated economic demand for the patented technology, and its probative value is greatly outweighed by the risk of unfair prejudice, confusion of the issues, and misleading the jury"; therefore, concluding the district court had abused its discretion in admitting the settlement agreement into evidence). Here, for the reasons discussed, the low probative value of the AUO agreement is substantially outweighed by the risk of confusion of the issues and the potential to mislead the jury. Accordingly, the Court excludes

the AUO settlement agreement and Plaintiffs' Motion is **GRANTED** as to Mr. Jackson's reliance on that agreement.

### C. Alternative Royalty Approaches

Plaintiffs next argue that Mr. Jackson should not be able to present his ten additional apportionment theories that only consist of "dividing the G8 step or parts of it by the number of steps in Claim 1." (Doc. No. 678, at 19.) Plaintiffs contend that these are arbitrary approaches that reflect nothing about a reasonable royalty for a license on the '958 Patent and will be offered merely so that the jury could pick one. *Id.* at 19–20. Defendants argue that Plaintiffs do not even identify Mr. Jackson's challenged theories or contend he used an improper mathematical method. (Doc. No. 698, at 17.) Rather, Defendants argue that absolute precision is not required in apportionment and Mr. Jackson should be allowed to provide different perspectives in considering how to value claim 1. *Id.*

The opinions Plaintiffs seek to exclude are set forth in Paragraph 20 of Mr. Jackson's report:



a) Approach 1 – I understand that CPT's internal documentation ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

b) Approach 2 – I understand that HannStar's internal documentation, ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

c) Approach 3 – I understand Claim 1 of the '958 patent references 10 steps and only the G8 step is the relevant distinction over the prior art.

        Accordingly, apportioning on a step basis would yield an apportionment factor of 10% (*i.e.*, 1/10).

d)    Approach 4 – I understand that claimed improvement of the '958 patent over the prior art is not the entire G8 step, but the addition of a fourth contact hole in addition to the three holes found in the prior art (within the G8 step).[20] Accordingly, assuming that those 10 steps can all be correlated to the complete array manufacturing processes of the accused product, apportioning on this basis would be done by taking 10% (as discussed in Approach 3) and reducing by 75% (to account for only one of the four holes being covered by the '958 patent). This would result in an apportionment percentage of 2.5% (*i.e.*, 10% times 25%) or lower.

e)    Approach 5 – This approach starts with the ▮ from Approach 1 and further reduces it by 25% for the reasons discussed in Approach 4 (*i.e.*, only one of the four contact holes not being found in the prior art). Accordingly, apportioning on this basis would yield an apportionment factor of ▮ (*i.e.*, ▮ times 25%).

f)    Approach 6 – This approach starts with the ▮ from Approach 3 and further reduces it by 25% for the reasons discussed in Approach 4 (*i.e.*, only one of the four contact holes not being found in the prior art). Accordingly, apportioning on this basis would yield an apportionment factor of ▮ (*i.e.*, ▮ times 25%).

g)    Approach 7 – I understand that Exhibit C-13 to the Expert Report of Dr. Elliot Schlam ("Schlam Report") references a CPT product and identifies a total of ▮ contact holes. I also understand that three of the 17 contact holes are covered in the prior art and the same three holes plus an additional fourth hole are covered in the '958 patent. Based on a review of the Supplemental Stewart Report, I understand that the other ▮ holes are not disputed by the parties and are not alleged to infringe the '958 patent.[21] Accordingly the differential is between the number holes claimed in the prior art (▮) and the number claimed in the '958 patent (▮[22] Accordingly, apportioning on this basis would yield an apportionment factor of ▮).

h)    Approach 8 – This apportionment factor is based on further reducing the apportionment factor of 10% discussed in Approach 1 and to account for the incremental change in the number of holes discussed in Approach 7 (*i.e.*, from ▮ ▮ ▮ ▮ ▮ ▮ ▮ ▮). Accordingly, apportioning on this basis would yield an apportionment factor of ▮ ▮).

i)    Approach 9 – This apportionment factor is based on further reducing the apportionment factor of ▮ discussed in Approach 2 and to

11

>account for the incremental change in the number of holes discussed in Approach 7 (*i.e.*, ███ ██ █ █ █ █ █ █ █ █). Accordingly, apportioning on this basis would yield an apportionment factor of ████████████████).

(Doc. No. 678-1, at ¶ 20.)

The Court agrees that these alternative approaches to apportionment set forth by Mr. Jackson are arbitrary divisions based on the number of claims, process steps, or contact holes without any connection to the economic demand for the claimed technology. These approaches therefore fail to pass muster under Rule 702. For example, perhaps most concerning is Mr. Jackson's approach number 3 where he identifies the total number of steps in the claim (10), states that only the G8 step is what should be valued, and therefore simply divides 1 by 10 to get an apportionment factor of 10%. This approach is inherently flawed because it mistakenly assumes that all ten steps of claim 1 are of equal value—*i.e.* each worth 10% of the whole. Mr. Jackson must concede this approach is arbitrary and all ten steps cannot be of equal value when, as discussed above, he devotes his analysis to discounting nine of the steps as "conventional" or already known in the art, and assigns the only value of the patented technology to the G8 step. Regarding the approaches that involve counting the number of contact holes in Defendants' products, or the number of steps in a process flow, those points will be better served addressed by Defendants' technical experts who are familiar with those technical documents or on cross-examination with Dr. Schlam.

Moreover, it appears the real intent behind Mr. Jackson's alternative approaches was to simplify ways to apportion in an effort to point out that Mr. Cobb has failed to apportion. *Id*. at ¶ 21. Mr. Jackson is free to disagree with or challenge Mr. Cobb's opinions without offering these alternative approaches to the jury. The risk that must be avoided is allowing Mr. Jackson, as a

damages expert, to present these alternatives to the jury so that the jury might pick one to calculate damages.

Accordingly, Plaintiffs' Motion as to Mr. Jackson's alternative approaches is **GRANTED**.

### D. TFT Array Royalty Base

Finally, Plaintiffs argue that Mr. Jackson's royalty base is flawed because it is limited to TFT arrays and flows from Mr. Jackson's assumption that the '958 Patent relates only to forming contact holes in the G8 step and not a method to manufacture LCD devices. (Doc. No. 678, at 20.) Plaintiffs' objection to Mr. Jackson's base is essentially the same objection stated with respect to the focus of Mr. Jackson's apportionment analysis being on step G8. For the same reasons discussed above, this is not a proper basis to exclude Mr. Jackson's opinions. Accordingly, Plainitffs' Motion as to Mr. Jackson's base calculation is **DENIED**.

### CONCLUSION

Consistent with the rulings set forth herein, Plaintiffs' Motion (Doc. No. 678) is **GRANTED-IN-PART** and **DENIED-IN-PART**. Within 14 days of the issuance of this Order, Mr. Jackson shall amend his report to remove the AUO settlement agreement and the alternative approaches set forth in Paragraph 20 of his current report. To the extent Mr. Jackson needs to supplement his report due to the exclusion of the AUO settlement agreement, he will be permitted to do so, and any supplementation should also be served within 14 days of the issuance of this Order. If Mr. Jackson supplements his opinions due to the absence of the AUO settlement agreement, Plaintiffs may seek an additional deposition, not to exceed 1 hour, within 14 days of any supplementation by Mr. Jackson. Plaintiffs' damages expert may also file a rebuttal report to Mr. Jackson's supplemental report within 14 days of being served, not to exceed 2 pages.

Within seven (7) days of the issuance of this Order, the parties shall file a notice with the Court as to whether this Order can be unsealed, or request appropriate redaction.

**So ORDERED and SIGNED this 29th day of March, 2017.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE